IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HUCKESTEIN MECHANICAL SERVICES, INC., )
          Plaintiff, )
           )
vs. )        Civil Action No. 13-479
           )
IC STAFFING SOLUTIONS, LLC and PHILIP M. )
SAUVAGEOT, )
          Defendants. )

## MEMORANDUM OPINION

Plaintiff, Huckestein Mechanical Services, Inc. ("Huckestein"), brings this action against Defendants, IC Staffing Solutions, LLC ("IC Staffing") and its owner, Philip M. Sauvageot, alleging claims of professional malpractice, breach of contract and conversion, arising out of accounting services that were provided to it by IC Staffing, Sauvageot and IC Staffing's former employee, Douglas Michael Foster. Plaintiff alleges that Defendants provided grossly and significantly inaccurate financial services, misrepresented that Foster was a certified public accountant and failed to uncover numerous acts of theft committed by Foster until after his death.

Presently pending before the Court for resolution is Defendants' motion for partial summary judgment with respect to Plaintiff's claims for conversion and breach of contract and Plaintiff's requests for punitive damages and select damages allegedly incurred to uncover and remedy theft and negligence. For the reasons that follow, the motion will be denied.

Facts

In January 2010, Wendy Staso purchased Huckestein and became its President and Chief Executive Officer ("CEO"). (Staso Dep. at 9:13-16.)[1] Staso purchased Huckestein from her husband, Keith Staso, and his business partner, John Bouloubasis. (Staso Dep. at 9:20-25.)

---

[1] Defs.' App. (ECF No. 36) Ex. A.

Mssrs. Staso and Bouloubasis owned Huckestein from approximately 2003 until January 2010. (Staso Dep. at 10:1-7.) When asked what led to her purchasing Huckestein, Wendy Staso testified as follows:

> The company started to not have enough money to pay its bills and so our family started to have to put money in the company to pay the bills. In order to have control over that investment, we could no longer live or deal with John [Bouloubasis] running the company.

(Staso Dep. at 10:18-25.)

Accounting Services from ICS, Inc.

From approximately January 2011 to August 2011, Huckestein received accounting services from Independent Controller Services, Inc. ("ICS, Inc.") (Am. Compl. ¶ 4.)[2] A portion of ICS, Inc.'s services were provided by Sauvageot, who was an employee of ICS, Inc. (or a company affiliated with ICS, Inc.) (Sauvageot Dep. at 23, 25, 40.)[3] Defendants indicate that the agreement provided that ICS, Inc. would act as a controller approximately one day per week to oversee the monthly transactional postings and closing procedures, to answer general accounting questions that might arise, and to review financial reports with Huckestein management on a monthly basis. (Sauvageot Dep. at 74.) They have attached the agreement between ICS, Inc. and Huckestein, which contains these terms. The proposal is dated September 22, 2010 and it was signed by Wendy Staso on January 5, 2011. (Defs.' Supp. App. Ex. G.)[4]

Sauvageot Creates IC Staffing

In approximately July, 2011, Sauvageot left ICS, Inc. and became the sole owner of IC Staffing, a company that provides general temporary staffing support, headhunter services, elderly in-home care and business and personal accounting services. (Sauvageot Dep. at 31, 33.)

---

[2] ECF No. 25.
[3] Pl.'s App. (ECF No. 39) Ex. E.
[4] ECF No. 42.

Huckestein learned that Sauvageot was leaving ICS, Inc., and Staso asked Sauvageot if IC Staffing wanted to keep the Huckestein account and if he could promise that there would be no gaps in service. (Staso Dep. at 21:17-22:11.) Sauvageot indicated that IC Staffing could provide the same accounting services to Huckestein that had been provided by ICS, Inc. (Sauvageot Dep. at 74.) These services included: negotiating payment arrangements with Huckestein's vendors, performing expense analyses, preparing budgets, doing payroll work, preparing cashflow reports, preparing financial information for company meetings, participating in meetings with company consultants, preparing information for company audits, doing accounts receivable and accounts payable reconciliations, preparing work-in-progress reconciliations, performing prepaid account analysis and reviewing financial statements. (Sauvageot Dep. at 44-47, 50, 53, 87-88, 90-92.)

Huckestein states that it accepted IC Staffing's offer to perform accounting services and retained IC Staffing, through a verbal agreement, to perform the functions of a controller at Huckestein, to handle Huckestein's financials and to staff accordingly. (Staso Dep. at 27.) Defendants respond that the agreement provided that IC Staffing would act as a controller approximately one day per week to oversee the monthly transactional postings and closing procedures, to answer general accounting questions that might arise, and to review financial reports with Huckestein management on a monthly basis. (Sauvageot Dep. at 74.) They cite the prior agreement between ICS, Inc. and Huckestein, which contains these terms. (Defs.' Supp. App. Ex. G.)

Huckestein contends that because IC Staffing was functioning as Huckestein's controller, it was the most senior entity maintaining Huckestein's finances, with the responsibility of

generating accurate financial information.  (Lally Dep. at 31-37.)[5]  Moreover, Sauvageot was the single point of accountability for anything financial at Huckestein. (Staso Dep. at 44.)

Defendants note that the agreement between ICS, Inc. and Huckestein explicitly stated that ICS, Inc. "will not audit or review the financial statements, and our engagement cannot be relied upon to disclose errors, fraud, or illegal acts that may exist."  (ECF No. 42 Ex. G at 2.)  They argue that this same provision applied to the agreement between Huckestein and IC Staffing.  They further contend that: Staso was the most senior person responsible for several aspects of Huckestein's financial functions during the relevant time period, including, for example: (1) she approved all payments of invoices and most credit card purchases; (2) on a weekly basis, without Sauvageot, she reviewed billing and collection issues; (3) she held a monthly financial review between management and Sauvageot; (4) she reviewed and signed every check that was issued, unless an emergency arose when she was out of the office; and (5) she drafted and revised the annual budget with the assistance of Mecal McDade (not Sauvageot). (Staso Dep. at 36, 55, 63, 76-7, 80, 111.)

After beginning to work at Huckestein, IC Staffing's accounting role increased, with IC Staffing assuming additional financial responsibilities, including managing cash and handling accounts payable, accounts receivable and data entry accounting functions at Huckestein. (Sauvageot Dep. at 83; Staso Dep. at 96, 106-07.)

Foster Begins Work at Huckestein

To handle these additional tasks, Sauvageot hired Douglas Michael Foster as an employee of IC Staffing, who reported to Sauvageot.  (Sauvageot Dep. at 129-30.)  Foster was

---

[5] ECF No. 39 Ex. A.  Defendants object to this averment, for which Plaintiff relies upon the testimony of its expert, John Lally.  Nevertheless, Lally testified that he based his information on an interview with Huckestein CEO Wendy Staso.  (Lally Dep. at 31.)

placed on-site at Huckestein to work on a daily basis. (Lally Dep. at 31-37; Sauvageot Dep. at 129-30.)  Defendants state that Foster also received on-site direction from Wendy Staso.  (Staso Dep. at 55, 63, 76-77, 80.)

Sauvageot represented to Huckestein management that Foster was a certified public accountant ("CPA") who would be more "accounting savvy" than the prior Huckestein employees that did the work. (Sauvageot Dep. at 131; Staso Dep. at 29-30.)[6] Sauvageot also represented that he was a CPA.  (Staso Dep. at 30.)

Huckestein has a board of directors with three members: Wendy Staso, Keith Staso, and Mecal McDade. (Staso Dep. at 36.)  Huckestein holds monthly board meetings to review the company's financials. (Staso Dep. at 36.) At its monthly board meetings, the Huckestein board is presented with a balance sheet and a profit and loss statement. (Staso Dep. at 36.)

During IC Staffing's engagement, Sauvageot attended Huckestein's monthly board meetings to present financial information. (Staso Dep. at 39.)  In 2011 and 2012, Huckestein held weekly staff meetings with its office personnel. (Staso Dep. at 72-74.)  Wendy Staso testified that the purpose of these staff weekly meetings was as follows:

> To review our financial situation, AR to AP, billing issues, collection issues, those kinds of things. So we had a financial review. We had an operations review, which is getting the work done. We had a sales review, what our people owe and who they are calling on, those kinds of things. We talked about any issues and then we have open discussion to talk about any issues that were impacting -- that people were having that would impact other people in the company, so that we could resolve those issues collectively.

(Staso Dep. at 73.)

After IC Staffing hired Foster, Sauvageot continued performing accounting services at Huckestein and purported to review and supervise Foster's work. (Staso Dep. 27-30, 44, 55, 58;

---

[6] Defendants deny this statement, but Wendy Staso testified to it.

Lally Rpt. at 2, 4.)[7]  Defendants deny that they reviewed Foster's work in an audit fashion.

<u>Foster's Alleged Theft</u>

During the time that Foster was providing services to Huckestein, Wendy Staso had two company signature stamps for writing checks. (Staso Dep. at 53:16-17.)  She gave Foster access to the signature stamps, one of which he kept in his desk. (Staso Dep. at 54:20-23.) She did so because Foster was working as an accountant and because IC Staffing managed the cash at Huckestein.  (Staso Dep. at 96, 106-07.)  Defendants deny that IC Staffing manage the cash; rather, it only provided a cash position report.

When asked whether she advised Sauvageot that Foster had a signature stamp, Mrs. Staso testified, "I don't believe I did." (Staso Dep. at 55:7-9.)  However, she stated that, as the controller, IC Staffing had responsibility to make sure its employees exercised proper controls. (Staso Dep. at 55:4-6.)

Defendants contend that Foster should not have had access to signature stamps or company credit cards.  (Sauvageot Dep. at 98:11-23.)  Their expert states that, as part of proper internal controls, only Staso should have had access to the stamps or she should have reviewed all checks written with the stamp.  (King Dep. at 110-16; King Rpt. at 11-12.)[8]

Huckestein's current accountant, Wendy Burton, testified she did not think that it would be acceptable internal control for her to have the signature stamp at her desk. (Burton Dep. at 38:1-4.)[9]  Burton also testified that Foster should not have had the signature stamp at his desk. (Burton Dep. at 38:5-7.)

Huckestein has identified five checks that Foster issued to himself using Staso's signature

---

[7] ECF No. 39 Ex. B.
[8] ECF No. 42 Exs. H, I.
[9] ECF No. 36 Ex. C.

stamp. (Burton Dep. at 32.)  These five checks issued to/by Foster were written on the following dates and in the following amounts -- for a total sum of $3,664.07:

> February 29, 2012: $67.38
>
> March 28, 2012: $1,742.24
>
> April 9, 2012: $155.17
>
> April 25, 2012: $1,199.28
>
> May 2, 2012: $500.00

(Pl.'s Expert Rpt. Ex. III.)[10]

Huckestein has identified 11 payments made from Huckestein's bank account to an HSBC credit card allegedly belonging to Foster. (Pl.'s Expert Rpt. Ex. IV.)[11] These 11 payments to the HSBC credit card occurred between March 8, 2012, and June 20, 2012, for a total amount of $5,084.02. (Id.) When asked what steps Huckestein took to confirm the owner of this HSBC card, Burton testified that she contacted the credit card company, and the individual with whom she spoke stated that the name on the account was Douglas Foster.  Huckestein did not receive any written confirmation that Foster was the owner of the card. (Burton Dep. at 39.)

Huckestein has identified six payments that Foster allegedly electronically issued from the Huckestein bank account to pay his personal Verizon Wireless account, for a total amount of $2,085.07. (Pl.'s Expert Rpt. Ex. IV.)  At the time of these payments, Huckestein also had multiple Verizon Wireless accounts. (Staso Dep. at 68.)  Huckestein's application systems manager (and former IT administrator), Edward Tworek, investigated the Verizon account allegedly improperly paid from Huckestein's bank account.  (Tworek Dep. at 9-10.)[12]

---

[10] ECF No. 36 Ex. B at 1.
[11] ECF No. 36 Ex. B at 2.
[12] ECF No. 36 Ex. D.

Tworek testified that his investigation consisted of the following:

> I was asked about Verizon Wireless. I called Verizon Wireless and discussed with them, "We have an account with you. There is charges coming out of our checking account going to you that I don't have any record of on our accounts, on our account side."
>
> They transferred me over to their treasury department. I spoke to their treasury department. They were unwilling to give up information for their own security reasons, but the representative I spoke to on the phone stated -- well, I asked the representative on the phone, "If I provide you with a phone number, can you at least tell me if this is the account that this money is going to?"
>
> The representative hesitated and said, "I could at least do that for you."
>
> At that time I gave them Mike Foster's personal cell phone number, and they confirmed that that was the account.

(Tworek Dep. at 25.)

Huckestein has identified one electronic payment of $457.80 issued from its bank account on June 18, 2012, to pay a DirectTV account allegedly in Foster's name. (Pl.'s Expert Rpt. Ex. IV.)  On behalf of Huckestein, Burton investigated this payment to DirectTV. (Burton Dep. at 29-30.)  She testified that she "contacted DirectTV, and the individual that I spoke with on the telephone at DirectTV told me that it was for Douglas M. Foster" and that ended her investigation. (Burton Dep. at 30:20-31:1.)

Huckestein has identified two orders from Staples, which include purchases that Foster allegedly made without permission: (1) a purchase on March 22, 2012, in the amount of $481.48; and (2) a purchase on June 13, 2012, in the amount of $267.46, for a total of $748.94. (Pl.'s Expert Rpt. Ex. V;[13] see also Staples invoices, ECF No. 36 Ex. E.)  Defendants state that both of the at-issue purchases from Staples include office supplies and/or equipment, and both were delivered to Huckestein's offices.  Plaintiff responds that the items were delivered to

---

[13] ECF No. 36 Ex. B at 3.

Huckestein's offices but were removed by Foster.  (Lally Rpt. at 4.)

Staso testified that, "Nobody has the authority to order from Staples without making a list of what they want and getting my approval to buy that stuff." (Staso Dep. at 80:20-22.) When asked whether Foster had requested approval for ordering supplies from Staples, Staso testified, "I don't remember." (Staso Dep. at 81:4-6.)  Defendants cite Burton's testimony that she did not personally search to determine whether the scanner Foster ordered was at the Huckestein facility. (Burton Dep. at 44-46.)  However, Plaintiff has submitted evidence that the items purchased in the two unauthorized on-line purchases from Staples, including a personal music player and digital camera, could not be located anywhere at Huckestein.  (Lally Rpt. at 4.)

Plaintiff contends that, as Huckestein's controller, it was IC Staffing's responsibility to establish and implement any necessary internal controls. (Lally Dep. at 44-45.)  Sauvageot never recommended to Huckestein management that they should implement internal accounting policies to prevent theft. (Staso Dep. at 58.)

After working at Huckestein (as an employee of IC Staffing) for a number of months, Foster died on June 19, 2012. (Staso Dep. at 66.) After Foster's death, Huckestein learned that Foster had stolen money from Huckestein over a period of several months as outlined above. (Lally Rpt. at 2-4.)

Plaintiff's expert states that, if Sauvageot had been properly overseeing and reviewing Foster's work at Huckestein, IC Staffing should have detected and prevented the theft. (Lally Rpt. at 4.)  Defendants respond that:

> IC Staffing and Sauvageot were properly overseeing Foster, but, given the following factors, there would be no reason for IC Staffing to detect the alleged theft during its routine work for Huckestein: (1) there was a short time period at issue because, with the exception of four payments to Verizon Wireless (at a time when Huckestein had multiple Verizon Wireless accounts), the instances of alleged theft identified by Huckestein occurred during the three and a half months

prior to Foster's death; (2) over the course of these months, Foster's alleged theft amounted to less than $12,000 at a company with annual revenues exceeding $7 million; and (3) according to Plaintiff's former outside accountant and current expert, Foster made efforts to conceal his alleged theft, which made it that much more difficult to uncover.

(ECF No. 41 ¶ 67.)

Foster did not record several of the theft transactions in Huckestein's general ledger and, in other instances, he grouped the theft with other business transactions and used vague descriptions to describe the group transactions in Huckestein's general ledger. (Lally Rpt. at 4.)

Plaintiff's expert states that, during the investigation after Foster's death, Huckestein also learned that, in addition to the theft, IC Staffing provided grossly and significantly inaccurate financial services to Huckestein. (Lally Dep. at 110-13; Lally Rpt. at 4-10.)  IC Staffing failed to set up and administer escrow accounts, failed to use proper banking accounts to execute payments, failed to properly track and pay overhead expenses, processed unauthorized vendor payments, failed to properly manage credit card accounts, failed to properly account for accounts receivable, failed to properly handle payroll and sales tax liabilities, provided inaccurate financial reports to management and failed to maintain an accurate general ledger. (Lally Rpt. at 4-10.)

Not surprisingly, Defendants' expert disagrees.  He places the blame on Huckestein for failing to implement proper internal controls.  (King Rpt. at 12-25, 36; King Dep. at 79, 92, 173-74.)

<u>Damages Allegedly Incurred to Uncover and Remedy Theft and Negligence</u>

Plaintiff is seeking to recover the costs incurred to identify and correct Foster's alleged theft and the Defendants' alleged accounting errors in the following amounts for the following individuals:

| Huckestein Employees | Hours | Damages Claimed |
|---|---|---|
| Wendy Staso (CEO) | 116 | $9,512.00 |
| Edward Tworek (Appl. Systems Manager) | 243 | $8,019.00 |
| Amanda Staso (Clerk) | 114 | $1,140.00 |
| Outside Services | | |
| WLR Services (Wendy Burton) | 932.07 | $41,943.15 |
| Klammarec Business Solutions (Mecal McDade) | 241 | $20,641.65 |
| Lally & Co., LLC | Unknown | $10,393.80 |
| | | Total: $91,649.60 |

Defendants state that Tworek does not do any accounting work. (Staso Dep. at 46:14-16.) Plaintiff responds that Tworek supports Huckestein's accounting department with information technology by managing and supporting Huckestein's enterprise resource planning software and by submitting work-in-progress reports to the accounting department. (Tworek Dep. at 10-11.)

Defendants state that Mecal McDade is an executive management consultant rather than an accountant. (Staso Dep. at 37, 48.) Plaintiff responds that McDade is a consultant for Huckestein that devoted a significant amount of time to the investigation and correction of IC Staffing's theft and accounting errors, as documented in her affidavit. (ECF No. 39 Ex. F.)

Defendants note that Staso testified that she and Tworek performed "ballpark calculations" when determining how many hours they spent on identifying and correcting the alleged accounting errors. (Staso Dep. at 115.) Plaintiff responds that she testified that she worked with Tworek "to come up with what we thought was a fair assessment of how much time of his was spent to do the cleanup work." (Staso Dep. at 115.)

Wendy Burton kept specific track of her hours spent on identifying and correcting the alleged accounting errors. (Staso Dep. at 115.) Tworek was not paid any overtime for his work. (Staso Dep. at 115.) Tworek receives an annual salary rather than an hourly income. (Staso Dep. at 116.) Huckestein did not hire anyone to assist with Burton's job while identifying and

correcting the alleged accounting errors. (Staso Dep. at 116.) Huckestein did not lose any customers due to the time spent identifying and correcting the alleged accounting errors. (Staso Dep. at 117.)

Plaintiff asserts that these errors caused significant damage to Huckestein's business and the effect of IC Staffing's grossly inaccurate financial services and substandard work was so significant that it overshadows whatever services may have been done correctly. (Lally Dep. at 111; Lally Rpt. at 4-10.) Plaintiff asserts that IC Staffing's services, including its failure to uncover Foster's theft and its accounting errors, fell below the standard of care expected of a reasonably prudent accounting professional. (Lally Dep. at 153-54.)

As Huckestein was uncovering IC Staffing's theft and errors, it was learned that Foster and Sauvageot misrepresented their accounting credentials to Huckestein, falsely claiming to be CPAs. (Staso Dep. at 29-30.) Sauvageot obtained an online degree in accounting from American Intercontinental University in 2007. (Sauvageot Dep. at 6, 13.) He is not, and never has been, a CPA. (Sauvageot Dep. at 6.) Foster was not a CPA. (Sauvageot Dep. at 127-28.) Questions remain about Foster's accounting credentials, as Sauvageot has no employment file on Foster. He did contact Foster's prior employer, Glessner & Associates, a CPA firm in West Virginia. Gary Glessner "spoke highly of Mike [Foster] and his skills." (Sauvageot Dep. at 111, 117-18, 127.)

Investigating IC Staffing's theft and correcting its accounting mistakes was a main priority of Huckestein because accurate and updated financials are especially important for a business in the construction industry (like Huckestein) because this information is used for bidding and obtaining jobs and loans. (Lally Dep. at 115-17.)

Several Huckestein employees and independent contractors spent time investigating and

working to correct these issues, including Wendy Staso (Huckestein's President and CEO), Edward Tworek (Huckestein's IT administrator / application business systems analyst), Amanda Staso (a temporary accounting clerk at Huckestein), Wendy Burton (WLR Services), Mecal McDade (Klammarec Business Solutions) and David Buttignol (Lally & Co., LLC). (Lally Rpt. at 9 & Ex. VI.)  In general, Wendy Staso oversaw the investigation and correction efforts, conducted weekly meetings on these efforts, addressed short-term cash needs, interacted with bank personnel and vendors and organized financial information.  (ECF No. 39 Ex. G.)  She also hired Amanda Staso, who reviewed, analyzed and organized documents found in Foster's home and office.  (ECF No. 39 Ex. G.)

In general, Edward Tworek retrieved and compiled electronic financial information and e-mails, checked the accuracy of reports generated by IC Staffing, investigated theft transactions and provided IT assistance in correction efforts.  (ECF No. 39 Ex. H.)

In general, Wendy Burton reviewed, analyzed and corrected bank statements, credit card statements, tax payments, accounts receivable information and accounts payable information, contacted and negotiated with hundreds of vendors and clients, and prepared and input corrected financial information.  (ECF No. 39 Ex. I.)

In general, Mecal McDade reviewed, analyzed and corrected vendor payments and accounts receivable information, reviewed Foster's correspondence, adjusted payment cycles and assisted within inputting corrected financial information. (ECF No. 39 Ex. F). In general, David Buttignol addressed general ledger accounting mistakes, bank reconciliation mistakes and mistakes in recording information in Huckestein's ERP system. His efforts are described in the Lally & Co. invoice. (ECF No. 39 Ex. J.)  Huckestein employees and consultants generated invoices and/or estimates of the daily amount of time spent on these efforts between June of

2012 and January of 2013. (Staso Dep. at 115; Lally Rpt. at 9 & Ex. VI; ECF No. 39 Exs. F, G, H, I, and J.)

Based on a review of the time estimates, interviews with these individuals and a detailed review of IC Staffing's theft and accounting errors, John Lally (Huckestein's testifying expert accountant) opines that the amount of time spent investigating and correcting IC Staffing's theft and errors was very reasonable given the magnitude of the situation. (Lally Dep. at 98-100.) Plaintiff contends that Mr. Lally's opinion is also supported by the monthly distribution of hours, which shows that (as he would expect) 75% of the hours spend investigating and correcting IC Staffing's theft and errors was performed in the first four months after Foster's death, with less time spent the later months tying down remaining issues. (Lally Dep. at 98-100.) Defendants' expert disagrees. (King Dep. at 164-74.)

Procedural History

On March 14, 2013, Plaintiff filed a complaint against Defendants in the Court of Common Pleas of Allegheny County, Pennsylvania. Count I alleged a claim of professional malpractice against IC Staffing and Count II alleged it against Sauvageot. The remainder of the complaint consisted of three claims against IC Staffing: Count III alleged a claim of breach of contract, Count IV alleged a claim of conversion and Count V alleged a claim of negligent hiring/supervising.

On March 28, 2013, Defendants filed a notice of removal, removing the action to this Court on the basis of diversity jurisdiction. On April 8, 2013, Defendants filed an amended notice of removal, to clarify that: Plaintiff is a Pennsylvania corporation with a principal place of business in Duquesne, Pennsylvania; IC Staffing is a limited liability company whose sole member is Sauvageot, a citizen of Ohio; and the amount in controversy, exclusive of interest and

14

costs, exceeds the sum of $75,000.00.  (ECF No. 3 ¶¶ 3-6, 10-16 & Ex. A.)

On April 8, 2013, Defendants filed a motion to dismiss Count V of the complaint, the claim for negligent hiring/supervision asserted against IC Staffing (ECF No. 5).  On April 25, 2013, a Memorandum Opinion and Order was entered (ECF No. 17), granting this motion and dismissing Count V of the complaint.  On August 7, 2013, Plaintiff filed an Amended Complaint (ECF No. 25) and on August 14, 2013, Defendants filed an answer thereto (ECF No. 26).

On April 30, 2014, Defendants filed a motion for partial summary judgment (ECF No. 33).  On June 6, 2014, Plaintiff filed its opposition (ECF No. 38) and on June 17, 2014, Defendants filed a reply brief (ECF No. 43).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendants contend that: 1) Plaintiff cannot maintain a claim for conversion because theft was not within Foster's scope of his employment and IC Staffing gained no benefit from it; 2) the breach of contract claim merely restates the accounting malpractice tort claim and the gravamen of the claim is not the breach of a particular contractual provision, but alleges that a professional failed to render services with the ordinary skill and knowledge of the profession; and 3) Plaintiff has no evidence to support either punitive damages or select damages for investigation and correction of accounting errors.

Plaintiff responds that: 1) under the Restatement (Second) of Agency § 261, a principal who puts a servant in a position where he commits fraud while apparently acting within his authority is liable to third parties for the servant's fraud even if the principal is innocent and the agent acted for his own purposes, so here IC Staffing is liable for having enabled Foster's fraud, which it would have uncovered with proper oversight and internal controls; 2) through a verbal agreement, Huckestein hired IC Staffing to perform the functions of a controller and Pennsylvania law recognizes that failure to perform accounting services in accordance with professional standards supports a breach of contract claim; and 3) whether Foster's conduct support a request for punitive damages is a jury question and a tortfeasor is responsible for reasonably foreseeable damages, including time spent investigating and repairing financial harm, and damages are not determined at the summary judgment stage, only whether there is a reasonable basis for calculating them.

In their reply brief, Defendants contend that: 1) the Restatement section does not apply unless Foster made express misrepresentations to Huckestein and he did not; 2) the breach of contract claim still requires an express contractual provision that was breached, not simply a tort claim that IC Staffing did not act "professionally"; and 3) there is no evidence that IC Staffing acted recklessly—rather, it appears that Foster stole a relatively small amount of money over a short period of time and made efforts to conceal it, and Plaintiff's investigative time is too high (one-third of economic damages and seven-and-a-half times the alleged theft amount), although Defendants admit this may be an issue of fact.

Determining State Law

The Court of Appeals has stated that:

> In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us. Kowalsky v. Long Beach Twp., 72 F.3d 385, 388 (3d Cir. 1995); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994). In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule. McKenna, 32 F.3d at 825; Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991) (in predicting state law, we cannot disregard the decision of an intermediate appellate court unless we are convinced that the state's highest court would decide otherwise).

Gares v. Willingboro Township, 90 F.3d 720, 725 (3d Cir. 1996). Because this is a diversity action, the Court must predict how the Pennsylvania Supreme Court would rule if presented with this situation. This is an issue of law to be resolved by the court. Bohler-Uddehom America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001).

Scope of Agent's Employment and Fraud

The Restatement of Agency indicates that:

A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third

17

persons is subject to liability to such third persons for the fraud.

Restatement (Second) of Agency § 261. Comment (a) to the above section states that:

> The principal is subject to liability … although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Id. cmt. a. See also Restatement (Second) of Agency §§ 262, 219(2)(d) (liability may be imposed when "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.").

The Pennsylvania Supreme Court adopted § 261 as the law in Pennsylvania in First National Bank v. Turchetta, 181 A.2d 285 (Pa. 1962). In that case, the court found that a car dealership could be held liable for a partner's theft through presenting forged documents to a bank, despite the partnership's innocence in the theft, lack of benefit therefrom and the claim that the partner had no authority to take the money. See also Bowman v. Home Life Ins. Co., 243 F.2d 331 (3d Cir. 1957) (district court erred in failing to instruct jury that, under § 261, insurance company could be held liable when its field employee posed as a doctor and committed unwanted touching of two female applicants for insurance, even though the company obviously received no benefit from his tortious conduct); Summit Airlines, Inc. v. Ganz, 160 B.R. 911, 918-19 (E.D. Pa. 1993) (law firm could be held liable for placing attorney in position of having access to client funds, which he converted by writing checks to himself); Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel, 832 F. Supp. 922, 932 (E.D. Pa. 1993) (same).

Defendants contend that these cases are distinguishable either because the tortfeasor was a partner (whose acts were deemed to be those of his fellow partners under the law) or because

the tortfeasor had made express misrepresentations to the third party. However, the cases do not make this distinction and Defendants have not explained why <u>their</u> liability (for placing Foster in a position which enabled him to commit acts of theft and fraud) depends upon whether Foster made express misrepresentations to Huckestein or simply quietly committed his acts. In either event, Huckestein was the innocent party and "where one of two innocent persons must suffer loss for the fraud of a third, the loss should fall on the one whose act facilitated it." <u>Bowman</u>, 243 F.2d at 334.

Defendants' citations are to cases that discuss the Restatement (Second) of Agency § 228, which states that conduct of a servant is within the scope of employment if but only if: a) it is of the kind he is employed to perform; b) it occurs substantially within the authorized time and space limits; and c) it is actuated, at least in part, by a purpose to serve the master. <u>Fitzgerald v. McCutcheon</u>, 410 A.2d 1270, 1271 (Pa. Super. 1979) (off-duty policeman who shot his neighbor during an argument following a night of drinking was not acting within the scope of his employment); <u>Sanchez by Rivera v. Montanez</u>, 645 A.2d 383, 388 (Pa. Commw. 1994) (community action program not vicariously liable for case worker's molestation of minor plaintiff since it was undertaken for purely personal reasons); <u>Matsko v. United States</u>, 372 F.3d 556, 559 (3d Cir. 2004) (United States not vicariously liable for federal employee's act of assaulting plaintiff who took his chair during a business visit since the "act" was not the retrieval of the chair but the assault, which was not within the scope of his employment); <u>Harris v. KFC U.S. Properties, Inc.</u>, 2012 WL 2327748 (E.D. Pa. June 18, 2012) (KFC not vicariously liable for employee's act of pistol whipping of customer with whom he was arguing because it was not the kind of act KFC expected him to perform and was not actuated with a purpose to serve the employer); <u>Amberg-Blyskal v. Transportation Security Admin.</u>, 832 F. Supp. 2d 445, 448 (E.D.

Pa. 2011 (TSA not liable for agent allegedly stealing plaintiff's jewelry while examining her

luggage at airport); Schloss v. Sears Roebuck & Co., 2005 WL 433316, at *2 (E.D. Pa. Feb. 24,

2005) (no vicarious liability for Sears based on allegation that technician who entered home to

fix plaintiff's washing machine stole her earrings, since that was not within the scope of his

employment).

As these case descriptions demonstrate, the question presented therein was primarily

whether an agent was acting within the scope of employment when he assaulted a third party.[14]

Here by contrast, the facts concern a fraud committed by an employee who was placed in a third

party's business by a principal.  As observed by the Court of Appeals for the Fifth Circuit:

> The proper inquiry for determining vicarious liability of a principal whose agent
> defrauds the principal's customer is the relationship between the principal and the
> customer…. The courts reasoned that a principal who provides his agent with the
> tools or position necessary to perpetrate a fraud on the principal's customers,
> should be held responsible to the innocent customers who relied on the agent….
> The premise underlying § 219(2)(d) and § 261 liability [is] a relationship between
> the principal and an innocent third party….

Entente Mineral Co. v. Parker, 956 F.2d 524, 529 (5th Cir. 1992).  See also Akins v. Golden

Triangle Planning & Dev. Dist., Inc., 34 So.3d 575, 582 (Miss. 2010) (Randolph, J., dissenting)

(genuine issues of fact should have precluded nonprofit economic development corporation

whose employee allegedly defrauded builder from obtaining summary judgment because "[i]n

employee theft/dishonesty/fraud cases … the standards outlined in Sections 219(2)(d) and 261 of

the Restatement (Second) of Agency apply.")[15]

This is an employee theft/dishonesty/fraud case and Plaintiff has raised liability pursuant

---

[14] In addition, Matsko and Amberg-Blyskal were cases under the Federal Torts Claims Act,
which explicitly waives governmental liability only when the governmental employee is "acting
within the scope of his … employment."  28 U.S.C. § 1346(b)(1).

[15] The majority opinion in Akins did not discuss § 261 because the plaintiff failed to plead or
argue it and thus it contained only a narrow ruling that vicarious liability under respondeat
superior did not apply.  Here by contrast, Plaintiff has raised the issue.

to § 261, not § 228. The principal (IC Staffing) had a relationship with the customer (Huckestein), and the customer has alleged that it was defrauded by the principal's agent (Foster). Whether or not Plaintiff could maintain a claim under § 228 is irrelevant. Therefore, Defendants' argument is rejected and the motion for summary judgment with respect to the conversion claim will be denied.

### Breach of Contract Claim for Professional Services

Defendants argue that Plaintiff cannot maintain a breach of contract claim for accounting services because it is merely alleging that they failed to comply with professional standards, rather than that they breached a specific contractual provision. Plaintiff responds that both claims may be maintained and that it has pointed to specific contractual provisions that were breached.

Under Pennsylvania law, breach of professional services, such as legal malpractice, can be advanced either as a tort claim or as a breach of contract claim. Bailey v. Tucker, 621 A.2d 108 (Pa. 1993). Some federal courts have predicted that Pennsylvania law would not allow for a breach of contract claim unless the plaintiff demonstrates that specific contractual provisions have been violated. See Stacey v. City of Hermitage, 2008 WL 941642, *4 (W.D. Pa. Apr. 7, 2008); Edwards v. Thorpe, 876 F. Supp. 693, 694 (E.D. Pa. 1995).

However, Pennsylvania state courts have not imposed this requirement. See Gorski v. Smith, 812 A.2d 683, 693 (Pa. Super. 2002). In Steiner v. Markel, 968 A.2d 1253 (Pa. 2009), a legal malpractice case involving property erroneously described in a deed, the Pennsylvania Supreme Court was faced with a statute of limitations issue, which it resolved by determining that the plaintiff had waived the issue of whether their professional malpractice claim was for breach of contract. However, in his dissent, Justice Saylor asserted that the court should have

taken the opportunity to clarify the "disordered area of the law" in which legal malpractice

claims may be stated under either contract or tort theories:

> [A] substantial, underlying conceptual problem in this case is that this Court has not detailed the elements of a contract-based cause of action for legal malpractice in a fashion which would meaningfully distinguish them from those necessary to support a tort-based cause. Indeed, the discussion of a contract-based cause in Bailey v. Tucker, 533 Pa. 237, 621 A.2d 108 (1993), suggests the elements of tort- and contract-based causes of action in this setting overlap substantially, if not completely. See id. at 251-52, 621 A.2d at 115. See generally 3 West's PA. PRAC., TORTS: LAW AND ADVOCACY § 6:29 (2008) (suggesting that, if Bailey is adhered to on its terms, "any distinction between contract and tort claims is practically meaningless" and plaintiffs, by mere skillful pleading may avail themselves of the longer limitations period). A counter-position has developed in the federal courts, which have effectively predicted this Court would require averment of a breach of some particular provision of the agreement of representation, or a failure to follow specific client instructions, to support a contract-based claim.

Id. at 1260, 1262 (Saylor, J., dissenting) (some citations omitted).

> In Koken v. Steinberg, 825 A.2d 723 (Pa. Commw. 2003), an auditor argued that:

> accountants may not be sued in contract for failing to properly provide professional services and that an action against them may only be brought in malpractice. The Court disagrees. Nothing in our law insulates accountants or other professionals from being sued in contract for a failure to properly perform professional services. Neither party can demonstrate anything in our law that says that an accountant may or may not be sued in contract based on allegations of malpractice, and the Court's research discloses nothing.

Id. at 730. The court held that it did accept that accountants should be held to the same

standards applied to attorneys in Bailey and held that the auditor was employed to

provide professional services; it promised to provide those services according to

"generally accepted accounting practices" which the court found to be "consistent with

those expected of the profession at large" and it was specifically alleged that its failure to

perform its duties as promised was the proximate cause of the damages. The court held

that these allegations were sufficient to state a claim for breach of contract.

Plaintiff argues that, through a verbal agreement, Huckestein retained IC Staffing to perform the functions of a controller at Huckestein with the responsibility of generating accurate financial information.  (Staso Dep. at 27, 44; Lally Dep. at 31-37.)  Through Sauvageot, IC Staffing agreed to (and purported to) perform accounting services that included negotiating payment arrangements with Huckestein's vendors, doing payroll work, preparing cashflow reports, preparing financial information for company meetings, preparing company audits, doing AR and AP reconciliations, reviewing financial statements, doing data entry and managing cash.  (Sauvageot Dep. at 44-47, 50, 53, 83, 87, 88, 90; Staso Dep. at 96, 106-107.)  Plaintiff contends that IC Staffing breached its contract with Huckestein because these tasks, which were an explicit part of the engagement agreement between Huckestein and IC Staffing, were not performed (or if performed, were not properly performed), and Huckestein did not receive the services that it bargained and paid for.  (Lally Dep. at 110-13; Lally Rpt. at 4-10.)

Pennsylvania law on the question of whether a plaintiff must point to a specific contractual provision in order to maintain a breach of contract action arising out of professional services, such as accounting, is uncertain.  In addition, Plaintiff has pointed to specific contractual provisions that it alleges Defendants breached.  Although the contract between ICS, Inc. and Huckestein was written, the contract between IC Staffing and Huckestein was oral.  Construing the facts in the light most favorable to Huckestein as the nonmoving party, it has supported a claim that Defendants breached specific contractual provisions that it agreed to perform.  Therefore, it can maintain its breach of contract claim and Defendants' motion for partial summary judgment as to this claim will be denied.

Punitive Damages

Under Pennsylvania law:

> punitive damages are an "extreme remedy" available in only the most exceptional matters. See Martin v. Johns-Manville Corp., 508 Pa. 154, 494 A.2d 1088, 1098 n. 14. (Pa.1985), rev'd on other grounds sub nom., Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800 (1989). Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either "the defendant's evil motive or his reckless indifference to the rights of others." Martin, 494 A.2d at 1096; see also Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (finding that punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in a fashion "so outrageous as to demonstrate willful, wanton or reckless conduct"). A defendant acts recklessly when "his conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent." Id. at 771 (citation omitted). Thus, a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. SHV Coal, Inc. v. Continental Grain Co., 526 Pa. 489, 587 A.2d 702, 705 (1991). Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to "intentional, willful, wanton or reckless conduct...." Id. at 704 (citation omitted).

Phillips v. Cricket Lighters, 883 A.2d 439, 445-46 (Pa. 2005) (footnote omitted).

Plaintiff contends that Foster's repeated theft and cover-up efforts create at least a jury issue as to whether his acts permit recovery of punitive damages and that IC Staffing is vicariously liable for Foster's tortious or criminal acts. It cites Rizzo v. Haines, 555 A.2d 58 (Pa. 1989) (attorney who fraudulently induced clients to transfer money to his account and withheld information, committing acts of breach of fiduciary duty and fraudulent misrepresentation, could be held liable for punitive damages); Shiner v. Moriarty, 706 A.2d 1228, 1240 (Pa. Super. 1998) (punitive damages could be assessed against attorney and his law firm for wrongful use of civil proceedings, abuse of process and intentional interference with contractual relations) ; and Dean Witter Reynolds, Inc. v. Genteel, 499 A.2d 637, 643 (Pa. Super. 1985) (punitive damages properly assessed against brokerage firm).

"It is well settled that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder." Dean Witter, 499 A.2d at 642. In addition, punitive damages may be awarded solely on the basis of vicarious liability of an agent. Id. "In Pennsylvania, there is no requirement that an agent commit a tortious act at the direction of his principal, nor must the principal ratify the act, in order for punitive damages to be imposed on him." Shiner, 706 A.2d at 1240. See also In re Phar-Mor, Inc. Sec. Litig., 892 F. Supp. 676, 695 (W.D. Pa. 1995) (reckless performance of audits could support a claim for punitive damages).

Defendants contend that Plaintiff has no evidence that they engaged in outrageous conduct with either an evil motive or a reckless indifference to Plaintiff's rights to support punitive damages for "reckless accounting practices" and that the alleged theft was performed by Foster, a non-party who used the money for personal expenses and Defendants did not ratify his behavior or accept or use money he stole. However, because there is no requirement that an agent commit an act at the direction of his principal or that the principal must ratify the act, to support a claim of punitive damages, the argument regarding Foster's conduct is irrelevant. With respect to Defendants' accounting practices, Plaintiff's expert opines that they were reckless and Defendants' expert contends that they were not. The trier of fact will have to make this determination upon hearing all the evidence. Therefore, with respect to the request for punitive damages, the motion for partial summary judgment will be denied.

Investigative Damages

Defendants argue that Plaintiff cannot recover the cost of investigating and repairing Foster's fraud. Plaintiff responds that such costs are recoverable and have been documented.

"A tortfeasor is liable for damages that are the reasonably foreseeable consequence of his

actions. The expenses incurred by Plaintiff as a result of Defendant's malfeasance, as well as the costs associated with the discovery of and payment to the victims of Defendant's wrongdoing, were clearly foreseeable results of Defendant's conduct." <u>Rubin Quinn</u>, 832 F. Supp. at 934.

Plaintiff has documented the amount of time that various individuals spent investigating and remedying Foster's acts. Defendants' initial brief relied upon a lack of support, which has now been presented. In their reply brief, they comment only that the damages appear to be excessive based upon the facts of this case. This issue cannot be resolved on a motion for summary judgment, but must be determined at trial. Therefore, the motion for summary judgment with respect to Plaintiff's request for investigative damages will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


HUCKESTEIN MECHANICAL SERVICES, INC., )
                Plaintiff,              )
                              )
        vs.                      )        Civil Action No. 13-479
                              )
IC STAFFING SOLUTIONS, LLC and PHILIP M. )
SAUVAGEOT,                     )
                Defendants.      )


ORDER

AND NOW, this 23rd day of July, 2014,

IT IS HEREBY ORDERED that Defendants' motion for partial summary judgment (ECF

No. 33) is denied.



                                           s/Robert C. Mitchell_____
                                          ROBERT C. MITCHELL
                                          United States Magistrate Judge